Freddie Wayne CHOATE *v.* STATE of Arkansas

CR 95-1327 925 S.W.2d 409

Supreme Court of Arkansas
Opinion delivered July 8, 1996

*William R. Simpson, Jr.*, Public Defender, by: *C. Joseph Cordi, Jr.*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Clint Miller*, Deputy Att'y Gen., Sr. Appellate Advocate for appellee.

BRADLEY D. JESSON, Chief Justice. Appellant Freddie Wayne Choate was convicted by a jury of the first-degree murder of Alfred "Pug" McHeran and was sentenced to life imprisonment. His sole allegation on appeal is ·that the trial court erred in denying his motion for directed verdict. Particularly, he argues that there was insufficient evidence to corroborate the testimony of the victim's widow and State's eyewitness, Francis "Carline" McHeran, whom he claims was an accomplice to the murder. We affirm.

The following evidence, as viewed most favorably to the State, was presented at trial. Carline McHeran testified that she and the victim, Pug McHeran, had been married for two years. Carline, who is white, and Pug, who was black, were homeless. They had been living together in a tent along the Arkansas River for eight years. On the evening of April 13, 1994, the two were at the Greyhound Bus Station in North Little Rock. Pug, an alcoholic, had been drinking whiskey all day. When Carline left the bus station to look for Pug, she found him outside talking to the appellant, who was driving a blue Dodge truck. Carline had never met the appellant before, nor had she seen him with her husband. When she approached the two men, they talked about going to Texarkana. Though ·Carline did not want to go on the trip, she got in the blue truck, explaining that she followed her husband wherever he went.

Carline sat in the middle of the cab between the two men. Appellant was driving. The three headed toward Texarkana before making a U-turn and proceeding toward Hensley in Pulaski County. Appellant and Pug began fighting over a whiskey bottle that Pug had. During the course of the argument, appellant, claiming to be from the Aryan nation, stated that he "hated niggers" and

interracial couples. According to Carline, appellant repeatedly stated he was "going to shoot that nigger." The argument escalated, and Pug wanted to get out of the truck. Appellant, who had been transferring a gun from one hand to the other, stopped the truck and shot Pug, causing him to fall forward. As Carline was leaning Pug back up, she noticed blood on the right sleeve of the shirt she was wearing. Appellant repeatedly threatened to kill Carline, telling her "I can kill you and get by with it." They proceeded down Cemetery Road in Hensley, where, at appellant's direction, Carline opened the passenger door of the truck, and the two pushed Pug out with their feet.

Michael Scroggins discovered the victim's body shortly after 11:00 p.m. on April 13. Officers from the Pulaski County Sheriff's Office arrived shortly after 11:30 p.m. Desiree Bell, who lived on a gravel road off Cemetery Road, was driving home when she observed the police. Bell testified that, after driving past the scene, she noticed an unfamiliar Dodge truck parked at the end of Cemetery Road. After the police were gone, she saw the truck drive back and forth down Cemetery Road.

Carline testified that, after her husband was pushed out of the pickup, she and appellant got lost on Cemetery Road for approximately three to four hours. On the way to Heber Springs, they stopped at a Shell Station on Sixth Street in Little Rock, where Carline called her daughter, Tanya "Tammy" Moore. Carline pleaded with her daughter to come get her, telling her "it was life or death." She then hung up the phone without giving Tammy the phone number, as she was afraid that if her daughter came to get her, appellant would "get them both."

Upon arrival in Heber Springs on April 14, appellant and Carline stopped to eat before checking into the Holiday Inn Express at approximately 10:00 a.m. Carline went to the front desk and inquired about the cost of a room. She then went outside to get money from appellant and returned to the front desk. She explained that she did not tell the hotel personnel anything because appellant had threatened to kill her. Appellant and Carline checked into Room 117 of the hotel. Once in the room, appellant told her to throw the bloodied shirt she was wearing in a trash bin. Appellant, who had told Carline he was a painter, left the room at approximately 6:00 a.m. the next day to go to work. Carline then called her sister, Patsy Yarberry, and told her where she was. Yarberry,

who had to go to work, called Tammy and told her to call the police. Officers found Carline at the hotel that morning, and after questioning her, arrested appellant for the murder.

Officer Sean O'Nale of the Pulaski County Sheriff's Office recovered the bloodied shirt from the hotel room and carpeting from the blue Dodge truck and sent both to the State Crime Lab. Jane Parsons, a serologist with the State Crime Lab, compared the victim's blood with the blood on the submitted items. According to Parsons, less than one percent of the African-American population in the United States would have had the combination of enzymes found on the auto carpet. It was her opinion that the blood on the carpet was consistent with the victim's blood. Parsons further opined that approximately two percent of the African-American population would have the combination of enzymes found on the shirt. There was nothing inconsistent with the blood on the shirt and the victim's blood. Dr. William Sturner, Chief Medical Examiner of the State Crime Lab, performed the autopsy on the victim and determined that his death was caused by a single gunshot wound to the head, which entered above the victim's left eyelid and exited through the back of the right side of the head.

The trial court, over the State's objection, concluded that there was sufficient circumstantial evidence from which the jury could have concluded that Carline was an accomplice, and thus instructed the jury with AMI Crim. 2d 403, entitled "Accomplice Status in Dispute — Corroboration." The trial court reasoned that the jury could look at the circumstances after the offense and determine that Carline was an accomplice to the murder, thus triggering the corroboration requirement. After hearing all the evidence in the guilt-innocence phase, the jury retired and returned a verdict of guilty of first-degree murder. The State presented evidence of appellant's four prior felony convictions, and the jury recommended that appellant be sentenced to life imprisonment. The trial court entered judgment accordingly, from which appellant now appeals.

 We examine the denial of a directed-verdict motion under the following standards:

This court treats the denial of a motion for directed verdict as a challenge to the sufficiency of the evidence. The test for determining the sufficiency of the evidence is

> whether there is substantial evidence to support the verdict; substantial evidence must be forceful enough to compel a conclusion one way or the other beyond suspicion and conjecture. On appellate review, it is only necessary for this court to ascertain that evidence which is most favorable to appellee, and it is permissible to consider only that evidence which supports the guilty verdict.

*King* v. *State*, 323 Ark. 671, 916 S.W.2d 732 (1996) (other citations omitted). In *King*, we also discussed at length the burden of proof on accomplice liability:

> The defendant bears the burden of proving that a witness is an accomplice. *Cole* v. *State*, 323 Ark. 8, 913 S.W.2d 255 (1996). An accomplice is one who, with the purpose of promoting or facilitating the commission of an offense, either solicits, advises, encourages, or coerces another person to commit the offense, aids, agrees to aid, or attempts to aid the other person in planning or committing the offense, or, having a legal duty to prevent the offense, fails to make a proper effort to prevent the commission of the offense. Ark. Code Ann. § 5-2-403 (Repl. 1993). One's status as an accomplice is a mixed question of law and fact. *Earl* v. *State*, 272 Ark. 5, 612 S.W.2d 98 (1981). One's presence at the crime scene or failure to inform law enforcement officers of a crime does not make one an accomplice as a matter of law. *Pilcher* v. *State*, 303 Ark. 335, 796 S.W.2d 845 (1990) (*citing Spears* v. *State*, 280 Ark. 577, 660 S.W.2d 913 (1983)).

323 Ark. at 677.

Contrary to the State's assertion in its brief, the jury in this case was instructed with AMI Crim. 2d 403, and was thus able to consider whether Carline was an accomplice to her husband's murder. The jury was thus instructed that if they found Carline to be an accomplice, her testimony must be corroborated by other evidence to connect appellant with the murder. The credibility of Carline's testimony was a matter for the jury to resolve and the jury was so instructed. In this case, we do not know whether the jury actually found that Carline was an accomplice. Even assuming that they did, there was sufficient corroborative evidence presented.

Patricia Allen, a bartender and waitress of the Rendevous Restaurant in North Little Rock, corroborated Carline's testimony

regarding appellant's motive for the murder. Allen testified that appellant was drinking Old Charter at the restaurant, located near the bus station, between 3:00 p.m. and 5:00 p.m. on April 13. Appellant began talking to Allen and asked her if she liked black people, and if she knew anyone who had anything to do with a white supremacist group. Appellant told her that he did not like "niggers." Desiree Bell testified that she saw an unfamiliar Dodge truck matching the description of the truck appellant was driving down the road from the murder scene. Bill Cooper testified that appellant had his blue Dodge pickup during the time of the murder. Moreover, both Carline's daughter, Tammy Moore, and her sister, Patsy Yarberry, described Carline as "hysterical" when they spoke with her on the phone. Brenda Ringer, an employee of Holiday Inn Express, testified that Carline appeared shaky and was trembling when she saw her in the hotel lobby. The blood found on the auto carpet and the blood on the shirt, both consistent with the victim's blood, corroborated Carline's story of how the murder occurred. Dr. Sturner's testimony about the trajectory of the gunshot wound is likewise consistent with Carline's account of how the murder took place.

■ Based on the foregoing, we conclude that the evidence was sufficient to support appellant's conviction for first-degree murder. We have reviewed the record pursuant to Ark. Sup. Ct. R. 4–3(h) and have determined that there are no errors with respect to rulings on objections or motions prejudicial to the appellant not discussed above.

Affirmed.

DUDLEY, J., not participating.