Clarence WILLIAMS *v.* STATE of Arkansas

CR 97-33                                            946 S.W.2d 678

Supreme Court of Arkansas
Opinion delivered June 9, 1997

*W. Ray Nickle*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Brad Newman*, Asst. Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. Following a jury trial, appellant Clarence Williams was found guilty of first-degree murder, kidnapping (2 counts), and attempted first-degree murder. He was sentenced to 20 years for first-degree murder, 40 years for kidnapping, and 12 years for attempted first-degree murder, with the sentences for kidnapping and attempted first-degree murder to run consecutively. The total term of imprisonment meted out was 52 years. He appeals on several grounds, none of which has merit. We affirm.

The State's case at trial was essentially comprised of the testimony of a co-defendant, William Hunt; a victim, Bradley Davis; and the statement taken from Williams by William Kucik of the FBI. William Hunt, age 20, testified that on April 8, 1995, he was riding with Antonio Britt and Scotty Hodges in a white Pontiac Bonneville that belonged to a friend of Britt's. The three men drove to Forrest City and then to Osceola where they picked up Clarence Williams. The four men ranged in ages from late teens to late twenties. They were driving and drinking when they were approached by two men (later identified as Bradley Davis and

Jonathan Hancock, who were approximately 19 at the time) in a white truck in Blytheville. Williams was driving the Pontiac. One of the men asked Williams if he had any crack cocaine for sale. Hodges yelled that he had some and directed the two men to pull over into a parking lot. After they did so, Hodges pulled a gun on the two men and demanded their money. Britt then jumped out of the Pontiac and said that he wanted the truck. Williams unlocked the trunk of the Pontiac, and the two men were forced into the trunk.

Williams drove off in the Pontiac with Hunt and Hodges, and Britt followed in the pickup truck. At some point, Britt pulled over, and Hodges left Williams and joined Britt in the truck. Hunt remembered turning up the music at Williams's request, but he could not remember if the title of the tape was "Lock 'em in the F***in' Trunk." He also could not remember if that song was played over and over. Williams led the way in the Pontiac down to the Mississippi River. Hunt testified that once they reached the river, Williams unlocked the trunk and grabbed one of the men from the Pontiac's trunk. Britt grabbed the other captive. Britt told the men to take off their clothes. At that point, Hunt testified that Williams said: "You've got to kill them, they've seen our face, you gotta waste 'em." Hunt testified that he urged that they not kill them. Hodges then hit one of the victims in the head with his gun, and it discharged, shooting the victim in the leg. Hodges then shot him a second time. Hunt testified that following the first shooting, he and Williams fled the scene on foot.

Hunt told the jury that only Hodges and Britt had guns and that both victims were sitting down and naked when the shooting began. Hunt said that he heard four more shots after he began running. Hunt ran back to Williams's house, which was about five miles away, and a friend of Williams drove him to his home the next afternoon. He learned that the police were looking for him, and he turned himself in.

William J. Kucik works for the FBI in Chicago. He was informed by a Jonesboro FBI agent that a warrant had been obtained against Williams for unlawful flight to avoid prosecution. He received an anonymous tip on Williams's location, and Wil-

liams was found in an abandoned apartment building. Williams initially told the officers that his name was Willie Morris, and he had Illinois identification to that effect. Williams eventually admitted that the name was false, and he gave a statement to Kucik while being processed. He told Kucik that he had come to Chicago three days after the incident in Mississippi County. He described to Kucik how three men came to his home the evening of April 8, 1995. The four men then rode in Britt's car, bought alcohol, and returned to Williams's home to drink. They next drove to Blytheville, and Britt showed Williams the liquor store that he had contemplated robbing. Williams told Britt that he did not want anything to do with the robbery. They next went to a friend's house and then to a local nightclub in Blytheville. They left the nightclub in search of drugs but were unsuccessful.

In his continued testimony, Kucik testified that Williams told him a white truck flashed its lights at them. The four men pulled up next to the truck at a stop sign. The passenger of the truck rolled down his window and asked where he could purchase $40 worth of crack cocaine. Britt told the man to pull over in a church parking lot. He got out of the car and took the money from the individuals. One of the group not named by Williams said the abducted men had more money, and this unnamed man and Britt forced the two men into the trunk of the car at gunpoint.

Williams told Kucik that he drove the white car and started speeding toward Osceola, hoping that the police would catch them. He said that he twice pulled over in order to let the victims out of the car but was told that nobody was leaving until they got to the river. Once at the river, Britt and the other man searched the victims. The other man was loudly playing a tape of a rap song called "I gotta Bop 'em," and announced that he was not going to leave any witnesses. That man shot one of the victims in the head at point-blank range. The other victim tried to catch the victim who was shot, and the man fired two or three more shots in the vicinity of the victims. Britt then pulled his gun and shot, but his gun jammed. The other assailant took the gun from Britt, unjammed it, and shot at the victims four more times. Williams said he left the scene and drove the car halfway to the levee.

Together with Hunt, he walked home through the woods because he was afraid that he too would be shot. Williams told Kucik that Hunt slept at his house that night and caught a ride home the next day. Williams later learned that Hunt had told his mother what happened, and she made him turn himself in to the police. Williams then fled to Chicago.

The surviving victim, Bradley Davis, also took the stand for the State. Davis, who was 21 at the time of the trial, was living in Gosnell with Jonathan Hancock on April 8, 1995. He testified that he and Hancock and two other friends were driving around in one of the friend's white truck, drinking beer, and "using a little drugs." They returned to their house and smoked crack cocaine. Later, Davis and Hancock went to Blytheville in search of more crack cocaine at about 1:00 a.m. In Blytheville, Davis saw four men at an intersection. He testified that though he had had quite a bit to drink, he remembered being taken from the truck at gunpoint and put in the trunk of the car. He handed one of the gunmen his empty wallet and checkbook. Before getting in the trunk, Davis saw two men with pistols and the driver of the white car, who got out to open the trunk. He said a fourth person was in the back seat of the Pontiac on the driver's side.

Davis testified that they started driving, and periodically the men in the Pontiac would ask Davis and Hancock if they were ready to die. The kidnappers also played a rap music tape and sang with the music. The rap music described what was happening to Davis and Hancock in that the song depicted a scenario of kidnapping people, putting them in a trunk, and murdering them while stealing their car. Davis testified that the car stopped twice and that the radio was turned up so that they could not hear the conversations. The conversations sounded serious, he said, and he occasionally heard laughter. He testified that after the second stop, the assailants played the same rap song repeatedly.

Prior to the trunk's being opened at the river, Davis remembered hearing a conversation that one of the guns was jammed and that one assailant needed bullets. When they were taken from the car, he and Hancock said their goodbyes and were told to undress. Davis told the kidnappers that they could have

the truck and that he and Hancock would go on about their business. He stated that he and Hancock were told to lie down on their backs naked. Davis was then shot in the arm and rolled over. He saw Hancock get shot in the face, and he waited to be mortally wounded. Once the shooting ended, Davis could hear the attackers "getting a kick out of it." He next heard the truck drive off.

Davis added that one of the four men did say before the shooting that they should let Davis and Hancock go, and once he was shot, Davis heard someone running off. He stated he also thought he heard another vehicle leave, but once he realized that he was not dead and got up, the white car was still there. He eventually ran toward a light on the riverbank. He woke the people in a riverboat and had them call 911. Davis was not able to identify Williams as the driver of the Pontiac.

Following the 911 call to the Blytheville Police Department, Davis was found by the deputies wrapped in a blood-stained sheet. He had been shot in the head or neck, arm, and leg. Dr. Peretti, Associate Medical Examiner, testified that Hancock died of three gunshot wounds, including two head wounds, and a blunt force head injury. He testified that one of the shots to the head was a contact wound.

The State rested its case, and Williams's counsel moved for a directed verdict on several grounds, including insufficient proof to make him an accomplice. The trial court denied the motions. In Williams's case in chief, he attacked inconsistencies between Davis's testimony and his various statements to law enforcement. Williams did not testify. Defense counsel announced to the court that he intended to introduce a second statement by Williams that was given to Mississippi County Sheriff's Deputy Ed Guthrie. The court ruled that the statement was not admissible. Williams was convicted and sentenced.

## I. Sufficiency of the Evidence

We first address the sufficiency of the evidence because Williams's double jeopardy rights require a review of a challenge to the sufficiency of the evidence before a review of trial

errors. *Bradford v. State*, 325 Ark. 278, 927 S.W.2d 329 (1996), *cert. denied*, 117 S. Ct. 583 (1996); *Passley v. State*, 323 Ark. 301, 915 S.W.2d 248 (1996). A motion for directed verdict is treated as a challenge to the sufficiency of the evidence. *Peeler v. State*, 326 Ark. 423, 932 S.W.2d 312 (1996). When a defendant challenges the sufficiency of the evidence convicting him, the evidence is viewed in the light most favorable to the State. *Dixon v. State*, 310 Ark. 460, 839 S.W.2d 173 (1992). Evidence, whether direct or circumstantial, is sufficient to support a conviction if the evidence is forceful enough to compel reasonable minds to reach a conclusion one way or the other. *Peeler v. State, supra*; *Dixon v. State, supra*. Only evidence supporting the verdict will be considered. *Moore v. State*, 315 Ark. 131, 864 S.W.2d 863 (1993).

Williams argues that the trial court erred in allowing the case to go to the jury because the State's entire case hinged on accomplice liability, and there was no proof that he assisted or actively participated in the kidnappings and shootings. He argues that his mere presence, acquiescence, silence, or knowledge that a crime was being committed is not sufficient to make him an accomplice. Williams admits that Hunt testified that he opened the trunk and told Britt and Hodges to kill Davis and Hancock, but he contends that there was no other evidence of this. He further argues that there was no proof that he participated in the aggravated robbery which was used as the predicate felony under the felony-murder rule.

This court has often cited the elements required to support accomplice liability:

> An accomplice is one who, with the purpose of promoting or facilitating the commission of an offense, either solicits, advises, encourages, or coerces another person to commit the offense, aids, agrees to aid, or attempts to aid the other person in planning or committing the offense, or, having a legal duty to prevent the offense, fails to make a proper effort to prevent the commission of the offense. Ark. Code Ann. § 5-2-403 (Repl. 1993). One's status as an accomplice ordinarily is a mixed question of law and fact. *Earl v. State*, 272 Ark. 5, 612 S.W.2d 98 (1981). One's presence at the crime scene or failure to inform law enforcement officers of a crime does not make one an accomplice as a matter

of law. *Pilcher v. State*, 303 Ark. 335, 796 S.W.2d 845 (1990) (*citing Spears v. State*, 280 Ark. 577, 660 S.W.2d 913 (1983).

*Choate v. State*, 325 Ark. 251, 255, 925 S.W.2d 409, 412 (1996), *quoting King v. State*, 323 Ark. 671, 916 S.W.2d 732 (1996).

We conclude that there is sufficient proof that Williams assisted in the commission of the crimes for which he was convicted. There is testimony that he drove the car, assisted in confining the victims, and encouraged the shootings. Specifically, Hunt testified that Williams as the driver opened the trunk for Hodges and Britt to confine the victims. It is also undisputed that Williams transported the victims to the river and led the truck to the location where the shootings took place. Hunt further testified that once they arrived at the river, Williams encouraged Hodges and Britt to "waste 'em" because the victims had seen their faces. Davis testified that he was tormented by his assailants asking if he was ready to die while the song, "Put 'em in the F***in' Trunk" was playing on the tape player. According to Davis and Hunt, only Williams and Hunt would have been in the car when the song was played. Hunt testified that he did not remember the song. Under these circumstances, the jury could well have inferred that Williams made the statements and played the song repeatedly.

We further conclude that Davis's testimony and Williams's statement offered sufficient corroborative proof that Williams drove the car with the victims in the trunk, played the rap music, taunted the captives, and drove them to the river in full knowledge that Britt and Hodges had guns and that an armed robbery had already been perpetrated.[1]

We affirm the trial court on this point.

## II.  Second Statement

The prosecution introduced only the statement given by Williams to FBI Agent Kucik at trial. Williams attempted to

---

[1] Williams made the corroboration argument to the trial court in somewhat veiled terms, but the State does not object to this argument on appeal, and we conclude that defense counsel adequately preserved the point.

introduce the second, more expansive and more exculpatory statement that he gave to Mississippi County Deputy Sheriff Ed Guthrie in his case-in-chief. The trial court denied introduction of the second statement. Williams argues that under Ark. R. Evid. 806 and Ark. R. Evid. 803(24), he should have been allowed to introduce the second statement to shore up his credibility, which was placed in issue by the introduction of the first statement.

Rule 806 reads:

> If a hearsay statement, or a statement defined in Rule 801 [d](2)(iii), (iv), or (v), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with his hearsay statement, is not subject to any requirement that he may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine him on the statement as if under cross-examination.

Ark. R. Evid. 806.

The principal reason for holding that Rule 806 does not apply to the facts of this case is apparent from the rule itself. Only if the defendant's credibility is attacked may his credibility be supported by other evidence. This is consistent with the general rule that the credibility of a witness cannot be bolstered until that witness has been impeached. *See McCormick on Evidence*, § 47 (4th ed. 1992). *See also George v. State*, 270 Ark. 335, 604 S.W.2d 940 (1980). Williams has not specifically shown where the State attacked the credibility of his first statement given to agent Kucik. It is true that Hunt's testimony varies somewhat from Williams's first statement, including reference to a comment made by Williams that "you gotta waste 'em." But this inconsistency is not an attack on the credibility of Williams's statement. We fail to see how the trial court abused its discretion in disallowing the second statement in this case.

Williams also contends that the trial court erred in refusing to allow the later statement under the residual hearsay

exception contained in Ark. R. Evid. 803(24). That rule provides that a statement should not be excluded as hearsay, even where the declarant is unavailable, when the statements are trustworthy and reliable. *See Ward v. State*, 298 Ark. 448, 770 S.W.2d 109 (1989). We question the reliability and trustworthiness of Williams's second statement, as did the trial court. Williams knew that a co-defendant, William Hunt, had implicated him. He had every reason to give deputy sheriff Guthrie a self-serving statement to minimize his participation in the crimes. There was no error by the trial court in this regard.

### III.    Use Immunity

Williams next argues that his due process and equal protection rights were violated by the trial court's refusal to grant immunity to Antonio Britt, who presumably would have testified in his favor. This court has said that the granting of immunity is not a constitutional right but merely one authorized by statute. *Fears v. State*, 262 Ark. 355, 556 S.W.2d 659 (1977). It is within the prosecutor's discretion to grant immunity when it is in the public's interest. *Id.* The reason for granting immunity is to aid in the prosecution of criminals by inducing witnesses to testify. *Id.*

Williams fails to cite any criminal case law or statute in support of his argument that his constitutional rights were infringed, and this failure to adduce apposite authority or otherwise to make a convincing argument is sufficient reason to affirm the trial court's ruling on this point. *Hall v. State*, 326 Ark. 318, 933 S.W.2d 363 (1996); *Dixon v. State*, 260 Ark. 857, 545 S.W.2d 606 (1977). It is also unclear from the abstract whether Williams obtained a definitive ruling from the trial court on this matter. We view Williams's contention on use immunity to be without merit.

### IV.    Biased Juror

Williams complains that the trial court committed error by refusing to grant a mistrial due to the participation of Ulysses Stewart on the jury. Juror Stewart had hugged Williams's mother in the hallway of the courthouse after the jury was selected. Wil-

liams's argument to the trial court was that Stewart knew that his integrity was now subject to question and that he would likely lean in favor of the State's case. Williams requested a mistrial on that basis, and it was denied. On appeal, he makes the same argument that the episode placed juror Stewart under unnecessary scrutiny.

A mistrial is a drastic remedy that should be granted only where the error is so prejudicial that justice cannot be served by continuing the trial or where the fundamental fairness of the trial itself has been manifestly affected. *Peeler v. State, supra.* The trial court is afforded broad discretion in making its ruling, and a mistrial will not be declared when the prejudice can be removed by an admonition to the jury. *Id.* This court has held that a trial court did not abuse its discretion when questioning a juror and the juror responded that he could maintain his objectivity. *Clayton v. State*, 321 Ark. 602, 906 S.W.2d 290 (1995).

As in *Clayton*, juror Stewart said that his relationship with Williams's mother "wouldn't have anything to do with how this case goes, or how come I serve." Moreover, counsel for Williams conceded that the court was "eloquent" in how he handled the questioning of juror Stewart. There is also the point that Williams did not ask for curative relief by striking Stewart and empaneling one of the alternate jurors but instead insisted on a mistrial declaration. There was no abuse of discretion by the trial court in denying the request.

*V. Proffered Instruction*

For his final point, Williams argues that the trial court should have accepted his proffered instruction which would have added language to the AMCI instruction that mere presence is not enough to establish accomplice liability. Williams concedes that the proffered language is not included in AMCI 2d 401 but observes that it is contained in the notes to the model instruction and is a correct statement of the law. The State counters that the model instruction was given and that this was all that was needed to state the law accurately.

■ The State is correct. It is not error to refuse to give a nonuniform instruction when a uniform instruction accurately reflects the law. *Moore v. State*, 317 Ark. 630, 882 S.W.2d 667 (1994); *Henderson v. State*, 284 Ark. 493, 684 S.W.2d 231 (1985). This court has recently rejected the precise argument now raised by Williams. *See Webb v. State*, 326 Ark. 878, 935 S.W.2d 250 (1996). There was no error in refusing to give the amended instruction.

Affirmed.