Lonezo PEETE and Cynthia Peete *v.* STATE of Arkansas

CA CR 96-1341                                             955 S.W.2d 708

Court of Appeals of Arkansas
Division I
Opinion delivered November 19, 1997

*W. Ray Nickle*, for appellants.

*Winston Bryant*, Att'y Gen., by: *Kelly Terry*, Asst. Att'y Gen., for appellee.

JUDITH ROGERS, Judge. Lonezo and Cynthia Peete, husband and wife, were found guilty by a jury of workers' compensation fraud, a violation of Ark. Code Ann. § 11-9-106(a)(1) (Repl.

1996) and a class D felony, for which they both received sentences of four years and eight months in prison. On appeal, appellants mount separate challenges to the sufficiency of the evidence to support their convictions, and they both contend that the trial court erred in denying their motion to dismiss based on the alleged violation of their right to a speedy trial. We hold that there was substantial evidence to support the verdicts of guilt and that no infringement of their right to a speedy trial occurred. Consequently, we affirm.

In January of 1993, appellant, Lonezo Peete, was hired as a lancer at Heckett Multiservice, a metal service company. On November 19 of that year, he sustained an injury compensable under the laws of workers' compensation when a bucket of hot metal that he was transporting exploded, resulting in burns to his legs, buttocks, and back. Mr. Peete was first treated at an emergency room and was released that night. He was subsequently seen for follow-up treatment by Dr. John Williams, the company doctor. Dr. Williams released Mr. Peete to return to work without restrictions on February 14, 1994, at which time the employer's insurance carrier ceased payment of temporary total compensation benefits. Mr. Peete did not report back to work as scheduled and was terminated effective February 22, 1994.

Mr. Peete thereafter pursued claims before the Workers' Compensation Commission seeking a change of physician to a psychologist and the continuing payment of temporary total disability benefits, contending that he suffered debilitating emotional damage as a result of the work-related injury. His claims were submitted by the employer's insurance carrier to the Workers' Compensation Fraud Investigation Unit.

Appellants were first arrested on May 26, 1994, but the charges were dismissed by the court without prejudice on June 25, 1995. The State reinstated the charges on July 12, 1995, and appellants' jury trial commenced on April 10, 1996.

■ Appellants first argue that the trial court erred in denying their motions for a directed verdict. A motion for a directed verdict is a challenge to the sufficiency of the evidence. *Bradford v. State,* 325 Ark. 278, 927 S.W.2d 329 (1996). In reviewing the

sufficiency of the evidence, we consider the evidence in the light most favorable to the appellee and affirm if there is substantial evidence to support the verdict. *Key v. State*, 325 Ark. 73, 923 S.W.2d 865 (1996). Substantial evidence is that which is forceful enough to compel a conclusion one way or the other and which goes beyond speculation and conjecture. *Davis v. State*, 325 Ark. 96, 924 S.W.2d 452 (1996).

Appellants' convictions are based on Ark. Code Ann. § 11-9-106(a)(1) (Repl. 1996), which provides as follows:

> Any person or entity who willfully and knowingly makes any material false statement or representation for the purpose of obtaining any benefit or payment, or for the purpose of defeating or wrongfully increasing or wrongfully decreasing any claim for benefit or payment or obtaining or avoiding workers' compensation coverage or avoiding payment of the proper insurance premium, or who aids and abets for either of said purposes, under the chapter shall be guilty of a Class D felony.

At trial, John Schmalzreid, Mr. Peete's supervisor, testified that it was his initial impression that Peete had only been burned in the accident, and he became suspicious when he heard reports that Peete was not able to move or function. According to Schmalzreid, his suspicions were also heightened by what he considered to be an excessive amount of medical supplies being ordered for Peete. He questioned the delivery person for the medical supply company as to whether Peete was "laid up," and was told that he was not, but that he had been seen "pacing." Mr. Schmalzreid notified his superiors of his concerns, and a private investigator was hired. Schmalzreid participated in the surveillance of the appellants on January 25, 1994, by videotaping a portion of their activities.

Mr. Schmalzreid testified that he had sent a letter to Mr. Peete on February 14, 1994, informing him that he had been released by Dr. Williams to return to work without any restrictions and that he was scheduled to work on February 19. He said that Peete did not report for work and that it was company policy to consider an employee as having voluntarily terminated his employment if no response is received from the employee within three days of scheduled work. He said that he sent Mr. Peete a

notice of termination on February 22. He also testified that he had several conversations with appellant, Cynthia Peete. Mr. Schmalzreid testified that she told him that she did not know how her husband could return to work because he was in a lot of pain. He said that she also complained that he was being treated with disrespect by his physicians.

Tom Meins, an investigator with Crockett Adjustment, gave testimony concerning the video footage of appellants taken by him and Mr. Schmalzreid on January 25, 1994. The tape was played for the jury and Mr. Meins described what it portrayed. He said that it first showed Mr. Peete coming out of his home on crutches and getting into the passenger side of a car. Ms. Peete then takes the crutches inside the home and returns to drive away in the car. Next, they arrive at Dr. Williams's office where Ms. Peete gets a wheelchair for Mr. Peete, and she pushes him across the parking lot and into the office. Later, they emerge from the doctor's office and Mr. Peete is placed in the car with the help of Dr. Williams's nurses. Last, the tape shows their return home. Mr. Peete gets out of the car unassisted, walks to the front of the vehicle, bends down to pet a dog, looks around, and then runs into the house.

Dr. John Williams, Mr. Peete's treating physician, testified that he first saw Peete the day after the accident and that he treated him on a regular basis until February 14, 1994. He said that Peete had sustained first- and second-degree burns primarily to his buttocks and right inner thigh, as well as a couple of small burns on his lower back. He stated that Mr. Peete's injuries were not life-threatening and described the worst injury as being a second-degree burn to the inner thigh that was the size of a videotape box. He said that the burns healed in about a month. Dr. Williams testified that Peete was ambulatory at the first visit but that he came to the office in a wheelchair for every other visit. He said that Peete complained of "chronic, horrible, intractable" back pain and asserted that he could not move his legs or bear weight on them. Dr. Williams testified that he could find no physical explanation for these complaints. He said that Peete's physical exams were normal and that results of x-rays, a lumbar CT scan, and an MRI were also normal. He also observed no sign of mus-

cle atrophy in Peete's legs, which would be indicative of disuse. Dr. Williams referred Mr. Peete to a neurologist for a second opinion. Still, no objective explanation was found to account for Peete's complaints. Williams said that he prescribed physical therapy because he could find no specific injury to Peete's back.

Dr. Williams also testified that Ms. Peete accompanied her husband to the office visits and that she would interject answers to questions when Peete did not respond directly. He also testified that Ms. Peete described her efforts in caring for Mr. Peete in this condition. She told him that family members helped but that she would lift him herself if necessary. Dr. Williams said that he questioned this because of her small stature and because moving him at the office was a chore that required the help of two nurses.

With regard to the office visit on January 25, the day the videotape was taken, Dr. Williams testified that Peete complained of back, neck, and wrist pain. Peete stated that this was the worst pain he had ever experienced and that therapy had not helped. Williams said that Peete would not get from the wheelchair onto the examination table because of the pain. Dr. Williams had viewed the videotape, and he testified that Mr. Peete's actions on the tape were not consistent with what appellants had represented Mr. Peete's abilities to be. It was his opinion that Mr. Peete was malingering.

In their defense, appellants offered the testimony of Dr. Russell Dixon, a clinical psychologist. He testified that Mr. Peete was referred to him for evaluation by Peete's attorney and that Ms. Peete was present during the interviews. He saw Peete on June 22 and July 13 of 1994, and on January 11, 1995. Dixon said that Mr. Peete was seated in a wheelchair during these sessions and that Peete indicated that he could not get out of the wheelchair because his back hurt. He testified that he had reviewed Peete's medical records and learned that there was no organic reason that would prevent him from walking. Because it was not clear to him why Mr. Peete could not walk, he considered the possibility that Peete was suffering from post-traumatic stress syndrome. Dixon explained that post-traumatic stress syndrome can occur when a person undergoes a traumatic event and said that fifty percent of

burn patients experience this condition. He described it as a "psychological numbing" that could cause a person to stop functioning. Dixon related that Mr. Peete was less verbally communicative during the second interview and that he appeared to be experiencing a great deal of anxiety. He said that Peete told him that he became more anxious when he recalled the accident. After this interview, Dixon could not say that Mr. Peete was suffering from post-traumatic stress syndrome, but he felt that it was worth further consideration. He testified, however, that the third interview was unproductive because Peete was even less communicative. He said that, although Peete gave him a fair amount of information during the first interview, Ms. Peete supplemented his answers to questions and that Ms. Peete spoke more as Peete became increasingly uncommunicative over the course of his evaluations. Dixon felt that Peete was depressed, but he could not make a conclusive diagnosis of post-traumatic stress syndrome.

On cross-examination, Dixon acknowledged that he knew the meaning of the term "malingering," saying that it was faking something for gain, and he said that he was familiar with the guidelines on that subject contained in the Diagnostic and Statistical Manual on psychology. Dixon agreed that, according to the manual, malingering should be strongly suspected if any combination of four factors were noted. He conceded that Mr. Peete exhibited three of the four factors. First, Peete was referred to him by an attorney. Second, there was a marked discrepancy between the claims of stress or disability and the objective medical findings. Third, there was a lack of cooperation during the diagnostic evaluations. He could make no determination as to the fourth factor concerning the presence of anti-social personality disorder. Dixon said that he would find it hard to disagree with a physician's opinion that Mr. Peete was malingering. He stated that it would have been helpful to have had access to Peete's deposition and the videotape of him in making his evaluation.

In rebuttal, Dr. Tom Heisler testified for the prosecution. A clinical psychologist, he conducted a forensic evaluation of Mr. Peete in February of 1996 on behalf of the State. In arriving at an opinion, he reviewed the medical reports of various physicians who had examined Mr. Peete, the report of Dr. Dixon, Peete's

deposition, and the videotape. It was his opinion that Peete was competent to stand trial, that he possessed the ability to appreciate the wrongfulness of his conduct, and that he was malingering. He testified that the essential feature of malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms motivated by external incentives such as avoiding military duty or work, obtaining financial compensation, evading criminal prosecution, or obtaining medication. His opinion was based on the four factors noted in the Diagnostic and Statistical Manual with particular emphasis on the second and third components of that test. The medical reports he had read indicated that there was no organic cause for Peete's inability to walk, and there was a lack of cooperation by Peete during the evaluation. Heisler said that he was also persuaded by the differences between Peete's verbal responses during his evaluation and Peete's testimony by deposition. He said that, during the deposition taken six months after the accident, Peete was articulate and that he gave detailed and often lengthy answers to questions. He said that, by contrast, Peete would utter one or two sentences or did not respond at all to twenty or thirty questions during his interview with Peete and that Ms. Peete had to tell him about the accident. By way of further example, Heisler related that Peete remained silent and answered none of the questions from the Welchler IQ test, such as identifying the shape of a ball or the colors of the American flag. He said that he did not know what to make of it at the time and was surprised when he later read the deposition in which Peete freely responded to questioning. He said that his opinion was also influenced by his review of the videotape, which depicted Mr. Peete walking. He said that it was a revelation to him because Peete was in a wheelchair during the interview, and he had observed Peete getting a drink from a water fountain, a task that took ten minutes to complete with the use of crutches supplied by Ms. Peete.

The deposition of Mr. Peete given in May of 1994 was read to the jury in its entirety. In it, Peete described the accident and the continuing difficulties he was experiencing from it. He said that, although Dr. Williams had released him to return to work without any restrictions, the pain was so bad that he thought he

was dying. He claimed that Dr. Williams had put him through pain, torture, and torment by prescribing physical therapy. He said that he had been using a wheelchair since the accident but that he had attempted to walk with the help of his wife. He asserted that his knees "give out" when he tries to walk and that pain shoots from his feet, legs, and back all the way to his head. Peete related that he was unable to sleep and that he had nightmares. He said his life was like a living hell and that he saw stuff blowing up and burning, which scared him. He described feeling "real, high-intensive" burning sensations, even though he knew that he was not burning. During the deposition, he was confronted with the videotape.

As his argument that the evidence was insufficient, Mr. Peete contends that there is no evidence that he made any false representations after January 25, 1994, the date the videotape was taken, or that he received any workers' compensation benefits after that date. We cannot agree.

■ There was substantial evidence from which the jury could conclude that appellant was not suffering from the debilitating effects of post-traumatic stress syndrome but that instead he was feigning this emotional condition and the inability to walk in an effort to obtain further workers' compensation benefits. Appellant's argument ignores the evidence that appellant presented himself in a wheelchair claiming that he was unable to walk soon after the accident and that he continued to make these representations, as reflected in his deposition and the sessions with Drs. Dixon and Heisler, all of which took place after January 25, 1994. Contrary to appellant's argument, the statute setting out this offense requires only that false statements or representations be made "for the purpose of obtaining any benefit or payment." It is not necessary for the accused to actually accomplish that goal. Here, it was shown that appellant pursued claims for additional benefits on the basis of these false representations. We thus cannot say that there is no substantial evidence to support his conviction.

■ ■ Ms. Peete's sufficiency argument is that there is no evidence that she knowingly made any false representations for the purpose of aiding or abetting her husband to obtain benefits.

However, there was testimony demonstrating that she was an active participant in this scheme. She escorted her husband in a wheelchair; she described his supposed physical limitations to others; and she answered questions put to him when he was unresponsive. She was also in a position to observe her husband's dash into the house that was depicted in the videotape. As the jury was instructed, an accomplice is one who, with the purpose of promoting or facilitating the commission of an offense, either aids, agrees to aid, or attempts to aid the other person in planning or committing the offense, or having a legal duty to prevent the offense, fails to make a proper effort to do so. Ark. Code Ann. § 5-2-403 (Repl. 1993); *Choate v. State*, 326 Ark. 251, 925 S.W.2d 409 (1996). There is substantial evidence supporting her conviction.

Appellants' final argument is that they were denied the right to a speedy trial and that the trial court erred in denying their motion to dismiss. Appellants contend that, because they were first arrested on May 25, 1994, their trial on April 10, 1996, exceeded the one-year limitations period found in Rule 28.1(c) of the Arkansas Rules of Criminal Procedure. In their argument, they maintain that only the periods between March 29, 1995, and June 5, 1995, and between June 5, 1995, and July 25, 1995, are subject to exclusion. Appellants' argument is without merit. Although they were arrested for this offense on May 25, 1994, the trial court dismissed the charges without prejudice on June 25, 1995. The record reflects that this dismissal was achieved on motion of the defense based on a defective referral from the Workers' Compensation Fraud Investigative Unit.

Rule 28.2 provides that:

> The time for trial shall commence running, without demand by the defendant, from the following dates:
>
> (b) when the charge is dismissed upon motion of the defendant and subsequently the dismissed charged [sic] is reinstated, or the defendant is arrested and charged with the same offense, the time for trial shall commence running from the date the dismissed charge is reinstated or the defendant is subsequently arrested or charged, whichever is earlier.

According to this rule, the time for trial commenced running on July 12, 1995, the date the charges were reinstated. Therefore, the trial on April 10, 1996, did not exceed the speedy-trial period.

Affirmed.

ROBBINS, C.J., and NEAL, J., agree.