Harry WARD *v.* STATE of Arkansas

CR 80-182                                              612 S.W. 2d 118

Supreme Court of Arkansas
Opinion delivered March 2, 1981

*E. Alvin Schay*, State Appellate Defender, by: *Jackson Jones*, Deputy Defender, for appellant.

*Steve Clark*, Atty. Gen., by: *Joseph H. Purvis*, Deputy Atty. Gen., for appellee.

JOHN I. PURTLE, Justice. The appellant was charged by information on October 3, 1979, of causing the death of Patra Bryant on October 1, 1979. He was tried before a jury on April 24, 1980, and was found guilty of murder in the first degree in violation of Ark. Stat. Ann. § 41-1502 (Repl. 1977). He was sentenced to life in prison. On appeal he alleges (1) that the court erred in failing to exclude a statement made by him while he was in custody and prior to receiving a Miranda warning; (2) that the court erred in allowing the prosecuting attorney to comment about the appellant's election to remain silent; and, (3) that the evidence was insufficient to support the verdict.

We agree with appellant on his second argument.

The facts reveal that Harry Ward and Everett "Jiggs"

Lincolmfelt had been friends for 40 years prior to October 1, 1979. They resided in rural Monroe County near Indian Bay, Arkansas. In fact, they were neighbors. On October 1, 1979, appellant and "Jiggs" Lincolmfelt were out driving around and drinking beer. Along about night the two of them decided to have a fish fry. They purchased a nice enough buffalo for about $5 and went to the home of Patra Bryant for the fish fry. For some reason the fish fry did not come off and appellant was asked to leave and to return in about 45 minutes for the purpose of picking "Jiggs" up. When Harry returned to the Bryant home neither "Jiggs" nor Patra Bryant were present. He started back to his own home when he noticed the light on at "Jiggs' " house. He drove into the yard and up next to the rear porch where he stopped his vehicle. From this point the testimony is very disputed with the appellant insisting that shortly after he arrived at Lincolmfelt's home that Lincolmfelt jumped him and beat him over the head with a gun. He alleges that the first thing that Lincolmfelt said to him was, "You son-of-a-bitch, I'm fixing to kill you." Appellant alleges he asked "Jiggs" what was the matter, and the reply was, "You have been married to a woman for 35 years that I have loved all my life." He also testified that Patra Bryant helped Lincolmfelt and that she used a. brick to strike him over the head. He stated he was momentarily rendered unconscious and upon regaining the ability to leave he went to his car and obtained a shotgun and fired two shots, one of which killed Patra Bryant. He said he did not know that he had injured anyone and was not aiming at anybody when he fired toward the house.

The undisputed evidence shows Patra Bryant was struck at fairly close range with a shotgun blast which almost severed her arm and apparently struck her heart. She died from the shotgun blast immediately. There was a brick with bloodstains on it found inside the house and a pool of blood which was not next to the body of the deceased. Also, appellant had numerous cuts and abrasions about his head. He was hospitalized for a period of time following the incident.

Lincolmfelt's story differs from appellant's story in that he claimed the appellant came at him and the deceased with

a pistol and fired several times. He stated he took the pistol away from the appellant and "pecked" him on the head with it. He denied that the deceased helped him beat the appellant up. He stated that after he took the pistol from appellant that appellant returned to his car and picked up the shotgun and fired into the house, and that one of the shots struck and killed Patra Bryant. His testimony clearly described the appellant as the aggressor.

Appellant returned home immediately after the incident at Lincolmfelt's house and sent his wife to get the constable. The constable, Jack George, arrived at the house of appellant soon thereafter and inquired, "What happened?" The appellant replied, "I shot 'Jiggs'." The constable, who was appellant's son-in-law, told appellant not to make any further statements. No further statements were made by the appellant. The "I shot 'Jiggs'" statement was used at the trial by the prosecution. Also, during the trial the prosecuting attorney openly referred to occasions when appellant refused to discuss the incident. At one time appellant told his attending physician that he would not discuss the matter and the other occasion was when he was taken into custody by the officers and refused to make a statement. The prosecutor in the closing argument mentioned that appellant "didn't tell the police officers anything," and that "he didn't have anything done about the people beating him up." He further remarked: "Mr. Ward didn't want to talk about the matter. He wanted to talk to his lawyers. He knew he was in trouble. No, he wasn't going to tell them. No, huh-uh, and there is a very good reason for that because he done wrong. He done wrong, and he knew he had done wrong."

The appellant took the stand in his own behalf and was questioned about all of the matters which the prosecutor argued. The trial court overruled the appellant's motion in limine in which he tried to prevent the prosecutor from arguing about the appellant's silence during the closing argument. The court allowed the arguments and the jury returned a verdict of guilty in the first degree and fixed appellant's punishment at life imprisonment.

## I.

We first consider the argument that the trial court erred in allowing the statement "I shot 'Jiggs' " to be introduced into evidence. The Fifth Amendment to the Constitution of the United States prohibits a person from being required to testify against himself. It gives him the right to remain silent but it does not guarantee that he will remain silent. In the present case it is doubtful that appellant was in custody although he had attempted to surrender himself to the constable. When the constable asked what was the matter, he replied, "I shot 'Jiggs'." At the time this statement was made the appellant was in his own home in the presence of his own family and the only officer present was his son-in-law, the constable. The constable never did really take the appellant into custody. He did remind him not to say any more than he had already said. The Miranda warning was set up for the purpose of enforcing Fifth Amendment rights by requiring that certain warnings be given to suspects prior to "custodial" questioning or interrogation. The Fifth Amendment does not preclude voluntary statements by an accused. *Beard* v. *State*, 269 Ark. 16, 598 S.W. 2d 72 (1980). Certainly, we cannot say when the statement is viewed with all of the circumstances that the court's ruling was against the preponderance of the evidence. *Degler* v. *State*, 257 Ark. 388, 517 S.W. 2d 515 (1974).

## II.

Appellant next argues that the prosecutor's comments made during closing argument concerning his prior silence violated his constitutional rights against self incrimination. The prosecutor reminded the jury that the appellant had refused to make any statement at the time he was arrested and when he went to the doctor. A portion of the prosecutor's closing argument is:

> ... No, he wasn't going to tell them. No, huh-uh, and there is a very good reason for that because he done wrong. He done wrong, and he knew he had done wrong. * * * He will come before you in the calm and the cool of the courtroom and rationality, and he will

surround himself with cloaks and with the constitution and with all its guarantees, and he will present his case to you, ladies and gentlemen of the jury, hoping your verdict will be rendered on sympathy because he claims to have a heart condition of some sort. * * * He will cloak himself with that and tell whatever he wants to because he's free to say whatever he wants to because he didn't say anything after it happened and is not liable for that.

Several other similar remarks were made by the prosecuting attorney during the closing argument. We believe these remarks amounted to prejudicial error, and that the case must be reversed on account of the argument of the prosecutor.

In the case of *Doyle* v. *Ohio*, 426 U.S. 610 (1976), the Supreme Court reversed the conviction because the prosecutor sought to impeach the accused's testimony by referring to his silence after he was arrested. Mr. Justice Powell, speaking for the majority, stated:

We conclude that the use of the defendants' post-arrest silence in this manner violates due process, and therefore reverse the convictions of both petitioners.

In reading this opinion we find that some of the questions asked of Doyle were the same questions as those asked of the appellant in the present case. We feel that *Doyle* is controlling in the present case.

We are not unmindful that the appellant made a motion in limine, prior to commencement of closing arguments, in which he sought to prevent the prosecution from making this type of argument. The court reasoned that the appellant had already taken the stand and waived his Fifth Amendment rights and that it would be proper to allow such statements in the closing argument. We think *Doyle* v. *Ohio*, supra, is controlling and that the statement should not have been allowed. This constituted prejudicial error. When a motion in limine is overruled, no further objection is needed.

## III.

The third point argued is that the evidence was insufficient to support the verdict. We all know that the standards for sustaining a verdict on appeal is governed by the rule of viewing the evidence in the light most favorable to the appellee. *Tatum* v. *State*, 266 Ark. 506, 585 S.W. 2d 957 (1979). Since the evidence will no doubt be different in the next trial, we will not deal further with this argument at this time.

Reversed and remanded.