David HALE *v.* STATE of Arkansas

CR 99-985 31 S.W.3d 850

Supreme Court of Arkansas
Opinion delivered December 7, 2000
[Petition for rehearing denied January 18, 2001.* ]

---

\* HANNAH, J., not participating.

*Bowden Law firm*, by: *David O. Bowden*; and *Tona M. DeMers*, for appellant.

*Mark Pryor*, Att'y Gen., by: *James R. Gowen, Jr.*, Ass't Att'y Gen., for appellee.

ANNABELLE CLINTON IMBER, Justice. The appellant, David L. Hale, brings this appeal from his conviction by a jury in Pulaski County Circuit Court for making a false or misleading

statement to the Arkansas Insurance Department in violation of Ark. Code Ann. § 23-60-109 (Repl. 1994). The jury sentenced Mr. Hale on that conviction to twenty-one days imprisonment in the Arkansas Department of Correction. Previously, in an interlocutory appeal by Mr. Hale, we affirmed the circuit court's denial of his motions to dismiss the State's charges against him. *Hale v. State*, 336 Ark. 345, 985 S.W.2d 303 (1999) (*Hale I*). In the present appeal, Mr. Hale raises five points on appeal: (1) there was insufficient evidence to support his conviction for violating Ark. Code Ann. § 23-60-109; (2) the trial court erred in not granting his motion to dismiss, when the prosecutor willfully used immunized testimony against him in violation of *Kastigar v. United States*, 406 U.S. 441 (1972); (3) the trial court erred in allowing the State to introduce video-deposition testimony in violation of his Sixth Amendment right of confrontation, Ark. R. Evid. 804, and Ark. Code Ann. § 16-44-202 ( Repl. 1999); (4) the trial court erred in refusing to compel a witness to testify in his behalf after the witness had been granted immunity from prosecution by the State; and (5) the trial court erred in denying his cumulative-error objection and in exhibiting a hostile attitude toward Mr. Hale and his counsel in violation of his Sixth and Fourteenth Amendment rights to a fair trial and due process of law. We find merit in none of the points raised, and we affirm.

At the trial of this case, the State claimed that in July of 1993 Mr. Hale entered into a complex scheme whereby he caused the president of National Savings Life Insurance Company (NSLIC) to make a false or misleading statement to the Arkansas Insurance Department in violation of Ark. Code Ann. § 23-60-109. NSLIC was wholly owned by a holding company, National Savings Corporation (NSC), and Mr. Hale owned 100% of the stock in NSC. Mr. Hale also owned a company called Emanon Marketing Inc. (Emanon), which was the general agency for his insurance business. Joseph Niemann had been hired by Mr. Hale in January 1992 to serve as president for both NSLIC and Emanon.

By letter dated March 17, 1993, the Commissioner of the Arkansas Insurance Department, Lee Douglass, in accordance with Ark. Code Ann. § 23-69-138, notified NSLIC and its president, Mr. Niemann, that NSLIC had a capital deficiency in the amount of $38,757. The letter further advised Mr. Niemann that if the deficiency was not corrected within thirty days after receipt of the

letter, Commissioner Douglass had authority, pursuant to Ark. Code Ann. § 23-69-138, to suspend NSLIC from soliciting or writing any new coverages in Arkansas until the deficiency was corrected, to deem NSLIC to be insolvent, and to institute delinquency proceedings against NSLIC.

Upon receipt of the March 17, 1993 letter, Mr. Niemann testified that he "took the letter to David Hale and we discussed it." He further stated that "we asked our attorney to meet with the Insurance Commissioner to see if he would grant us an extension to solve the deficiency, which he did." Mr. Niemann also confirmed that the Insurance Commissioner granted a ninety-day extension of time to cure the deficiency and that Mr. Hale knew about the extension. Likewise, Mr. Hale testified that "we" decided to get an extension, so they called their attorney, Allan Horne, to handle the matter. Although Mr. Niemann and Mr. Hale both denied that Mr. Hale attended a meeting with the Insurance Commissioner regarding the extension, Commissioner Douglass testified that he met with Mr. Hale and Mr. Horne regarding the extension, and Mr. Hale "sat in my office and told me that he would cure the impairment with a cash infusion and that he was trying to position the company where he could sell it." Thus, Mr. Hale began the process of attempting to cure NSLIC's capital impairment within the extended ninety-day period.

Mr. Hale entered into a series of transactions with George Michael Rutherford of Houston, Texas in 1993. The exact nature of these transactions was in dispute. Mr. Rutherford, along with his wife, Lisa Forbes, and Rebecca Winemiller, controlled an Arkansas company called FSA Financial Systems, Inc. (FSA). Mr. Rutherford testified that in May or June of 1993, he and Mr. Hale began discussions about FSA investing in a company called Med-A-Corp by means of a stock-swap or a preferential buy-out. According to Mr. Rutherford, they eventually agreed to do a stock swap between FSA and Med-A-Corp. He then stated that Mr. Hale "requested to borrow a couple of hundred thousand dollars to complete the deal with Med-A-Corp." Mr. Rutherford noted that he did not have $200,000, but he had just put $150,000 into a company called Ink Jet. Therefore, he agreed to loan Mr. Hale $150,000 from Ink Jet.

Mr. Hale gave a different version of his dealings with Mr. Rutherford. He testified that in 1993 Mr. Rutherford and Ms.

Winemiller asked him to invest in FSA through his small business investment company, Capital Management Services, Inc. (CMSI). Although Mr. Hale told them that he could not invest any cash, he offered to let them look at CMSI's investment portfolio. As a result of that offer, they became interested in Med–A–Corp because the inactive company still held patents for "certain kinds of medical computer software." Pursuant to those discussions, Mr. Hale stated that FSA purchased 420 shares of Med–A–Corp from CMSI on March 14, 1993, and paid for those shares by transferring 420 shares of FSA stock to CMSI. Mr. Hale testified that Mr. Rutherford again approached him in May of 1993 about investing in his insurance agency, Emanon. Mr. Hale stated:

> So he asked me if he bought a [sic] $150,000 in Emanon, the agency, could the agency buy $150,000 in his company — could — he said, you know, I said, "You can buy $150,000 worth of stock in the insurance company, and the insurance company can buy $150,000 of your stock." ... And it proceeded on to there, and then he kind of — he made the decision about, oh, first of June, mid-June, and that's when we got Joe Niemann involved, and the stock purchase [agreement] was signed on June the 27th.

In support of Mr. Hale's testimony, the defense introduced into evidence a June 27, 1993 stock purchase agreement signed by Mr. Niemann as president of NSLIC and Lisa Forbes as president of FSA. According to that agreement, FSA agreed to sell and NSLIC agreed to buy 150 shares of $1000 par value preferred stock in FSA.

Shortly thereafter, on July 1 or 2, 1993, Mr. Rutherford directed an employee of Ink Jet to give Mr. Hale a check for $150,000 when he was ready for the money. In the meantime, Mr. Rutherford went to Texas. The State's exhibits, as confirmed by the testimony of Mr. Rutherford, Mr. Hale, and Mr. Niemann, show a series of transactions beginning on Thursday, July 1, 1993, as follows:

July 1, 1993

- $150,000 cashier's check from First Commercial Bank made payable to Ink Jet

- Deposit slip for $150,000 into an Ink Jet bank account

July 2, 1993

- $150,000 check from Ink Jet to Emanon Marketing, Inc., signed by Thomas Quinlan of Ink Jet

- Deposit slip for $150,000 into account at Pulaski Bank (Mr. Hale testified that Mr. Niemann deposited the check into the account of Emanon)

- $150,000 check from Emanon to NSC, signed by Joe Niemann

- Deposit slip for $150,000 into account of NSC

- $150,000 check from NSC to NSLIC, signed by David Hale

- Deposit slip for $150,000 into account of NSLIC

Mr. Niemann testified that Mr. Hale showed him the check from Ink Jet to Emanon on July 2, 1993, and told him that it should go to NSLIC as a capital contribution. When asked "[w]hat did [Mr. Hale] tell you to do with it[,]" Mr. Niemann stated: "Well, it was obvious it was meant to go to Emanon Marketing to be eventually contributed to National Savings Life Insurance Company." He further confirmed that he deposited the check into Emanon's account "so I could write [NSC] a check so they would in turn contribute the capital to [NSLIC]." He also testified that Mr. Hale told him about his plans for NSLIC to use the money to buy preferred stock in FSA. When Mr. Niemann expressed concern about FSA stock not being an admissible asset, Mr. Hale stated: "Don't worry about it. ... They have the financials to support it, and it will be an admissible asset."

Following NSLIC's receipt of the $150,000 from NSC, Mr. Niemann, as president of NSLIC, signed and sent a letter to the Arkansas Insurance Department on July 6, 1993. That letter stated, in relevant part, as follows:

> Under date of March 17, 1993 we were advised that National Savings Life Insurance Company in accordance with Ark. Code. Annotated 23-69-138(a) had a capital impairment in the amount of $38, 575. Subsequently, you allowed a 90 day extension for the Company to correct this deficiency.

> Enclosed you will find a receipted deposit slip in the amount of $150,000 to the savings account of the Company. This is a capital contribution from our parent, National Savings Corporation.

Should you desire any additional information concerning this matter please so advise.

Attached to the letter was a copy of the July 2, 1993 deposit ticket showing that $150,000 was deposited into NSLIC's account. Mr. Niemann testified that he wrote the July 6 letter to the Insurance Commissioner because the $150,000 capital contribution to NSLIC cured the earlier deficiency. With regard to Mr. Hale's involvement in writing the letter, he stated:

> I don't exactly recall whether I said, "We need to write the letter," to David Hale, or whether David Hale said to me, "We need to write the letter." We simply talked about the fact that the Insurance Commissioner had to be advised that — or should be advised that our deficiency had been solved.

Mr. Niemann also stated that he inferred from his July 2 meeting with Mr. Hale that he needed to write the letter. Mr. Hale acknowledged during his testimony that he was familiar with the letter to the Insurance Commissioner.

It is this July 6, 1993 letter that forms the basis of the State's information charging Mr. Hale with making a false or misleading statement to the Arkansas Insurance Department in violation of Ark. Code Ann. § 23-60-109, in conjunction with Mr. Rutherford's testimony regarding (1) a conversation he had with Mr. Hale on July 2, 1993, and (2) Mr. Hale's subsequent return of the $150,000 to Mr. Rutherford on July 6, 1993. Specifically, Mr. Rutherford testified that he could not find any information on Med-A-Corp after he loaned Mr. Hale $150,000 to complete the deal with Med-A-Corp. According to Mr. Rutherford, he called Mr. Hale on July 2, the same day that the $150,000 check from Ink Jet had been delivered to Mr. Hale, and asked him to hold the check and return it when Mr. Rutherford got back to Little Rock the following week. Mr. Hale agreed to return the money as requested. Mr. Rutherford further testified that he returned to Little Rock on Tuesday, July 6, and Mr. Hale gave the money back to him on that date. That transaction is evidenced by the following exhibits introduced by the State at trial, each of which is dated July 6, 1993:

- Savings account debit slip signed by Mr. Niemann showing that a $150,000 cashier's check had been written to FSA out of NSLIC's account

- $150,000 cashier's check from NSLIC to FSA

- Deposit slip for $150,000 into the account of FSA

Mr. Hale denied that Mr. Rutherford ever asked for the $150,000 back and maintained that the $150,000 check to FSA on July 6 was payment for FSA stock as evidenced by the June 27 stock purchase agreement.

Based primarily on Mr. Rutherford's testimony, the State asserted below that NSLIC's letter of July 6, which stated that the company's capital deficiency had been cured, was false or misleading and thereby violated section 23-60-109, because the capital deficiency had in fact not been corrected as the letter indicated. In essence, the State charged that Mr. Hale had placed the $150,000 provided by Mr. Rutherford in the account of NSLIC long enough to state in the July 6 letter that the capital deficiency had been cured, and then he returned the money to Mr. Rutherford. The investigation leading up to Mr. Hale's prosecution and conviction began when, by a letter dated September 21, 1993, Mr. Niemann notified the Arkansas Insurance Department that the impairment had not actually been cured on July 6, as the earlier letter had indicated, because "the funds were subsequently invested in a security I believe is a non-admissible asset."[1] Based on that notification by Mr. Niemann, the Insurance Commissioner ordered an examination, and the Arkansas Insurance Department petitioned for appointment of a receiver for NSLIC on September 27, 1993. NSLIC was subsequently placed into a receivership under the auspices of the Insurance Commissioner.

---

[1] Mr. Nieman testified that he caused the July 6 cashier's check for $150,000 to be issued to FSA pursuant to the instructions of Mr. Hale and on the understanding that the $150,000 was to constitute payment for FSA stock. However, in August of 1993, when no FSA stock certificates or financials were received by NSLIC to show that the FSA stock was an admissible asset, Mr. Niemann began to get worried. He then spoke to Mr. Hale about his concerns on September 21 or 22 and told Mr. Hale that "I didn't feel like the $150,000 was an admissible asset and that I needed to advise the Insurance Department that we had not solved the impairment on our capital … deficiency." Mr. Hale responded: "You've got to do what you've got to do." Accordingly, Mr. Niemann wrote the letter, dated September 21, to the Arkansas Insurance Department. In Mr. Hale's version of these events, he states that he knew about the letter, but did not meet with Mr. Niemann about it. He said that he and Mr. Niemann merely discussed the fact that FSA had become worried about NSLIC and wanted to "back out" of the stock purchase agreement.

## I. Sufficiency of the Evidence

■ For his first point an appeal, Mr. Hale challenges the sufficiency of the evidence supporting his conviction. When reviewing the sufficiency of the evidence on appeal, this court does not reweigh the evidence but determines instead whether the evidence supporting the verdict is substantial. *McFarland v. State*, 337 Ark. 386, 989 S.W.2d 899 (1999). Substantial evidence is defined as direct or circumstantial evidence that is forceful enough to compel reasonable minds to reach a conclusion one way or another and that goes beyond mere speculation or conjecture. *Id.; Bailey v. State*, 334 Ark. 43, 972 S.W.2d 239 (1998). In determining whether there is substantial evidence, this court reviews the evidence in the light most favorable to the State. *McFarland v. State, supra.* Only evidence supporting the verdict is considered. *McFarland v. State, supra.* We will affirm if there is any substantial evidence to support the verdict. *Harris v. State*, 331 Ark. 353, 961 S.W.2d 737 (1998).

■ As a threshold matter, Mr. Hale argues that this court should follow the standard of review set out by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307 (1979), where the Court, in determining whether habeas corpus relief should be granted to a defendant convicted of murder, stated: "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* The State suggests initially that Mr. Hale failed to make this argument below and, therefore, is precluded from raising it on appeal. We note that Mr. Hale's motion for directed verdict incorporated language similar to the above-quoted language in *Jackson v. Virginia*: "no jury could reasonably find that there was proof beyond a reasonable doubt as to the element of intent." Thus, we conclude that Mr. Hale is not barred from arguing on appeal that this court should explicitly adopt *Jackson's* "rational fact-finder test" as the proper standard of review. In that regard, we considered a similar argument in *Jones v. State*, 269 Ark. 119, 598 S.W.2d 748 (1980), and concluded that the language in *Jackson v. Virginia* does not require us "to abandon our decisions regarding the test of whether a jury verdict should stand in a criminal case. There must be substantial evidence to support such a decision." *Id.*, 269 Ark. at 120, 598 S.W.2d at 749. Once again, for the reasons stated in *Jones v. State*, we

decline to explicitly adopt *Jackson's* "rational fact-finder test" as the appropriate standard of review when there is a challenge to the sufficiency of the evidence. Accordingly, we will adhere to the substantial-evidence test in reviewing the sufficiency, of the evidence in this case.[2]

With regard to the substance of Mr. Hale's first argument on appeal, we now consider whether there was sufficient evidence to support his conviction for violating section 26-60-109, which states:

> Any person who files any statement, application, form, or other document required to be filed by this code, knowing the statement or information contained in the document to be false or misleading in any material respect, shall be guilty of a felony and upon conviction shall be punished by a fine of not more than five thousand dollars ($5,000) or by imprisonment in the Department of Correction for not more than three (3) years, or by both fine and imprisonment.

Mr. Hale contends that the evidence is insufficient in three respects: (1) the State failed to prove that he filed a document; (2) the State failed to prove that the document was required to be filed by the Insurance Code; and (3) the State failed to prove that he knew the statement to be false or misleading at the time it was filed. We conclude that all of these arguments are without merit.

In making the argument that the State failed to prove that he filed a document, Mr. Hale characterizes Mr. Niemann's memory as "somewhat fuzzy regarding all the events surrounding this matter." With regard to the events leading up to July 6, 1993, when the letter was written to the Arkansas Insurance Department, Mr. Niemann testified as follows:

> Well, it came to be written because the $150,000.00 capital contribution to National Savings Life Insurance Company — it solved the deficiency in the company that was mentioned in the Commissioner's letter that he wrote back in March. ... Well, I wrote the letter because the deficiency had been impaired [sic]. I don't

---

[2] The State also suggests that Mr. Hale fails to argue on appeal, as he did at trial, that his conviction is not supported by substantial evidence. We disagree. Mr. Hale contends on appeal that neither the rational fact-finder test nor the substantial-evidence test has been met in this case.

exactly recall whether I said, "We need to write the letter," to David Hale, or whether David Hale said to me, "We need to write the letter." We simply talked about the fact that the Insurance Commissioner had to be advised that — or should be advised that our deficiency had been solved.

Mr. Hale asserts there was no evidence that he instructed Mr. Niemann to write the July 6 letter. That assertion fails to acknowledge Ark. Code Ann. § 5-2-503(a) (Repl. 1997), which provides that:

A person is criminally liable for any conduct constituting an offense that he performs or *causes* to be performed in the name of or in behalf of an organization to the same extent as if that conduct were performed in his own name or behalf.

(Emphasis added.) Thus, the issue here is whether there is substantial evidence that Mr. Hale caused the document to be filed with the Arkansas Insurance Department. Mr. Niemann testified unequivocally that Mr. Hale knew about the letter before it was filed. Indeed, Mr. Hale acknowledged during his testimony that he was familiar with the letter. Furthermore, Mr. Hale was the owner of NSLIC and was the only person directing the events that caused $150,000 to be deposited into NSLIC's account, thereby triggering the need to notify the Insurance Department that the deficiency had been cured. According to Commissioner Douglass's testimony, Mr. Hale came to see him to ask for an extension of time to cure NSLIC's capital deficiency and told him that he was going to cure the deficiency by means of a "cash infusion." Subsequently, Mr. Hale entered into negotiations with Mr. Rutherford, which resulted in $150,000 being deposited into NSLIC's account on July 2. Once Mr. Hale received the $150,000 check from Mr. Rutherford, Mr. Hale directed Mr. Niemann to put the money into NSLIC's account as a "capital contribution." That infusion of cash into NSLIC came about solely as a result of Mr. Hale's dealings with Mr. Rutherford, and, without it, the July 6 letter to the Insurance Commissioner would not have been written and filed with the Arkansas Insurance Department. This evidence directly supports the conclusion that Mr. Hale caused the filing of the July 6 letter and, therefore, was ultimately responsible to the same extent as if he had filed the letter himself.

■ Mr. Hale next contends that the filing of the July 6 letter with the Insurance Department was not required by the Insurance Code. He is clearly mistaken. The meaning of the term "this code" as used in section 23-60-109 is defined in the note to Ark. Code Ann. § 23-60-101 (Repl. 1994) to include sections 23-69-105— 23-69-141. Thus, "this code" includes Ark. Code Ann. § 23-69-138(c) (Repl. 1994), which provides in relevant part:

> If the deficiency is not made good and proof thereof filed with the commissioner within the thirty-day period, the insurer shall be deemed insolvent and the commissioner shall institute delinquency proceedings against it....

The plain language of section 23-69-138(c) required the filing of the July 6 letter. Moreover, Commissioner Douglass testified that the July 6 letter advising the Insurance Department that the capital deficiency had been cured was "a statutory requirement of curing the impairment," and Mr. Hale admitted during his own testimony that he knew of the "requirement" that the Insurance Department be notified when NLSIC's capital deficiency was cured.

■■ Finally, Mr. Hale argues that the State failed to prove that he knew the statements contained in the July 6 letter were false at the time the letter was mailed on July 6, 1993. Mr. Hale fails to recognize that Ark. Code Ann. § 23-60-109 allows the jury to convict if the information contained in a document is *either* false or misleading in any material respect. The July 6 letter from NSLIC to the Insurance Department noted NSLIC's capital impairment in the amount of $38,575 and then stated that $150,000 had been deposited into the savings account of the company, thereby purportedly indicating that the capital impairment had been cured. However, Mr. Rutherford testified that he gave Mr. Hale the check for $150,000 on July 2 and then called Mr. Hale later that same day and asked him to return the money. According to Mr. Rutherford, Mr. Hale agreed during that phone call on July 2 to return the $150,000 to him during the week after the July 4 holiday. This evidence shows that Mr. Hale knew when the July 6 letter was sent to the Insurance Department that (a) he was going to have to return the $150,000 to Mr. Rutherford sometime during that week, and (b) NSLIC's capital impairment had not been cured. For these reasons, we hold that the evidence supporting Mr. Hale's conviction for violating Ark. Code Ann. § 23-60-109 is substantial.

## II. Kastigar Doctrine

For his second point on appeal, Mr. Hale contends that the State committed two violations of the doctrine of *Kastigar v. United States,* 406 U.S. 441 (1972). In his previous interlocutory appeal to this court, Mr. Hale challenged the State's ability to prosecute him due to his plea agreement with the Independent Counsel for the Department of Justice, in which the Independent Counsel granted Mr. Hale immunity. *Hale v. State,* 336 Ark. 345, 985 S.W.2d 303 (1999). Although our opinion in *Hale I* upheld the trial court's ruling that the State had not violated *Kastigar v. United States,* we issued a warning:

> In reaching this conclusion, however, we admonish, as the trial court correctly did, that the Kastigar issue continues throughout the trial and prevents the State from impermissibly using any of Mr. Hale's immunized testimony, or the evidence derived therefrom, at any point in the state proceeding.

*Hale v. State,* 336 Ark. at 358, 985 S.W.2d at 309. Mr. Hale now contends that the State impermissibly used his immunized federal testimony on two occasions.

We have thoroughly summarized *Kastigar v. United States* and its progeny in *Hale I.* Once the defendant demonstrates that he has testified under a grant of immunity from one sovereign, another sovereign may nevertheless prosecute the defendant for related crimes so long as the prosecutor sustains the heavy burden of proving that its evidence was derived from a legitimate source wholly independent of the compelled testimony. *Hale v. State, supra.* One sovereign's right to prosecute those persons who violate its criminal laws is not thwarted or diminished by another sovereign's grant of immunity. However, the prosecuting sovereign may not use, directly or indirectly, the immunized testimony or any fruits from it. *Hale v. State, supra* (citing *United States v. First Western State Bank,* 491 F.2d 780 (8th Cir. 1974)). The defendant need only show that he testified under a grant of immunity. After that, the burden shifts to the prosecution to prove that all of the evidence it proposes to use was derived from legitimate independent sources. *Hale v. State, supra.*

In this appeal, Mr. Hale contends that a *Kastigar* violation occurred when excerpts from his immunized grand-jury testimony

were discovered in the Little Rock Police Department case file. Upon discovering the excerpts in the police file, Mr. Hale moved for a *Kastigar* determination, and the trial court held a hearing on March 16, 1999. The following day, the trial court issued an order denying Mr. Hale's *Kastigar* motion and refusing to dismiss the case. In doing so, the trial court found that there was no showing by the prosecution that the immunized grand-jury testimony was used in any way and that the testimony contained in the police file did not bear any relationship to the charges in the present case.[3] Floyd Strayer of the Little Rock Police Department, who investigated David Hale's case, testified that they did not see or use the grand-jury testimony in any way. The trial court apparently believed this testimony. We will not second-guess such credibility determinations. *Hale v. State, supra.*

Mr. Hale also contends that another *Kastigar* violation occurred when he took the stand in his own defense and was cross-examined by the State. During that cross-examination, Mr. Hale asserts the prosecutor impermissibly used his immunized testimony in the federal proceeding as impeachment material.[4] As Mr. Hale states in his brief, a review of the cross-examination reveals that the prosecutor possessed an intimate and detailed knowledge of the contents of Mr. Hale's federal testimony and that the prosecutor based a large portion of his cross-examination upon the federal testimony. While conceding that many of the questions asked by the prosecutor "directly referenced [Mr. Hale's] testimony in federal court," the State contends that Mr. Hale's argument is procedurally barred from appellate review because he did not make a contemporaneous objection.

We have frequently held that a contemporaneous objection must be made to the trial court before we will review an alleged error on appeal. *Jones v. State*, 340 Ark. 390, 10 S.W.3d 449 (2000) (holding that the appellant's argument was barred because he did not object to the introduction of certain character evidence

---

[3] The trial court found that Mr. Hale's grand-jury testimony was given under "a grant of full transactional immunity."

[4] Mr. Hale was shown a transcript of the testimony he gave at his federal sentencing hearing and at Jim Guy Tucker's trial in federal court. Although the State has argued otherwise for the first time at oral argument, both parties have consistently assumed, beginning with *Hale I*, that Mr. Hale's testimony in the federal proceedings was compelled testimony. This court made a similar assumption in *Hale I*.

until after two witnesses had already so·testified). In order to properly preserve an issue for appeal, the defendant must timely object at the first opportunity and renew his objection each time the witness is questioned about the matter. *Smallwood v. State,* 326 Ark. 813, 935 S.W.2d 530 (1996) (holding that the issue was not preserved because the defense counsel waited until after the witness had answered the question once and the State had asked the question a second time before objecting); *Hill v. State,* 285 Ark. 77, 685 S.W.2d 495 (1985) (holding the issue was not preserved because the appellant allowed the State to ask the objectionable question eight times in various forms before finally objecting). In the instant case, the prosecutor's first question regarding Mr. Hale's federal testimony occurred on page 2224 of the record, without objection. The prosecutor continued to question Mr. Hale about his federal testimony time and time again, until finally, on page 2247 of the record, defense counsel made the *Kastigar* objection.[5] Based upon this record, the *Kastigar* issue is not preserved due to the lack of a contemporaneous objection.

 Mr. Hale argues that a contemporaneous objection is not required when the *Kastigar* doctrine is at issue because *Kastigar* motions may be raised before, during, or after trial. It is true that the issue in *Kastigar v. United States* arose before trial, and in *United States v. McDaniel,* 482 F.2d 305 (8th Cir. 1973) the issue was raised post-trial. However, neither case establishes an exception to our contemporaneous-objection rule. This court has previously noted that the defendant's rights under *Kastigar* were preserved by defense counsel making the "appropriate objections" at trial. *Young v. State,* 316 Ark. 225, 871 S.W.2d 373 (1994).

 We view the present situation much like those cases in which a motion in limine was filed prior to the trial. When such a pretrial motion is denied, the issue is preserved for appeal and no further objection at trial is needed. *Neal v. State,* 320 Ark. 489, 898 S.W.2d 440 (1995); *Massengale v. State,* 319 Ark. 743, 894 S.W.2d 594 (1995); *Dalyrymple v. Fields,* 276 Ark. 185, 633 S.W.2d 362 (1982); *Ward v. State,* 272 Ark. 99, 612 S.W.2d 118 (1981). Here, Mr. Hale made a pretrial *Kastigar* motion that was denied. That motion involved certain excerpts of his immunized grand-jury tes-

---

[5] According to the State's brief, the State asked Mr. Hale 135 questions before he lodged an objection based upon a *Kastigar* violation.

timony that were found in the Little Rock Police Department file. Nothing in Mr. Hale's pretrial *Kastigar* motion related to the federal testimony used by the prosecutor during his cross-examination of Mr. Hale at trial. This court has held that "failure to object at trial precludes the party from relying on anything disclosed at trial which was not brought out at the pretrial hearing." *Sutton v. State*, 311 Ark. 435, 844 S.W.2d 350 (1993). Because the use of Mr. Hale's federal testimony on cross-examination was not within the scope of his pretrial *Kastigar* motion, a timely and contemporaneous objection at trial was necessary.

 Even if we were to conclude that our admonition in *Hale I* could be interpreted as a favorable ruling that prohibited the State from impermissibly using any of Mr. Hale's immunized federal testimony at any point in the proceeding, it would still be necessary for Mr. Hale to make a contemporaneous objection to the prosecutor's repeated use of the immunized federal testimony in order to preserve the issue for appellate review. The reason is that the trial judge must be given an opportunity to timely correct the mistake. *Johnson v. State*, 308 Ark. 7, 823 S.W.2d 800 (1992). Otherwise, if a contemporaneous objection is not made at the time the evidence is offered during the jury trial, the proverbial bell will have been rung and the jury prejudiced. *Stewart v. State*, 332 Ark. 138, 964 S.W.2d 793 (1998). When a defendant successfully objects to a question on the basis of hearsay, and the same or similar question is later asked, the defendant must renew his objection or else the initial objection is waived. *Marvel v. Parker*, 317 Ark. 232, 878 S.W.2d 364 (1994). There is no affirmative duty on a trial court to subsequently make evidentiary rulings on its own motion. *Mills v. State*, 321 Ark. 621, 906 S.W.2d 674 (1995); *Friar v. State*, 313 Ark. 253, 854 S.W.2d 318 (1993).

The dissent acknowledges that we do not follow the "plain error" rule, under which plain errors affecting substantial rights may be noticed although they are not brought to the attention of the trial court. *Lovelady v. State*, 326 Ark. 196, 931 S.W.2d 430 (1996). Moreover, we have stated on numerous occasions that even constitutional arguments are waived on appeal unless raised below. *Friar v. State, supra.* In its valiant effort to overcome this court's longstanding adherence to the contemporaneous-objection rule, the dissent submits that the trial court had a duty to intervene and prevent a *Kastigar* violation under one of the exceptions to our objection

requirement listed in *Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980). That exception, however, is based on obiter dicta and no judgment has ever been reversed on account of a trial court's failure to intervene on its own motion. *Id.* Furthermore, as we stated in *Lovelady v. State*, "we have never held that a trial court has a duty to declare a mistrial on its own motion when a prosecutor calls a witness in violation of a privilege ..." 326 Ark. at 199, 931 S.W.2d at 432. In any event, the exception is limited to the trial court's duty to intervene and correct a serious error "either by an admonition to the jury or by ordering a mistrial." *Wicks v. State*, 270 Ark. at 786, 606 S.W.2d at 369. Here, the prosecutor cross-examined Mr. Hale extensively about his federal testimony before defense counsel interposed a *Kastigar* objection. At that point, instead of asking for an admonition to the jury or a mistrial, the defense counsel moved for dismissal of the charges. Under these circumstances, it is clear that this case does not come within the *Wicks* exception cited by the dissent.[6]

Finally, based upon the colloquy that took place when defense counsel finally did object to the prosecutor's use of Mr. Hale's immunized testimony, the dissent and the concurrence both suggest that the trial court may not have known this was a *Kastigar* violation. That is exactly the reason for our contemporaneous-objection rule; when the trial judge does not know that an error has occurred, it is the aggrieved party's duty to promptly object so that the trial judge is afforded an opportunity to timely correct the mistake. *Johnson v. State, supra.* This was not done.

### III. Video-deposition testimony

For his third point on appeal, Mr. Hale relies upon three distinct arguments. First, he argues that the use of Mr. Rutherford's video-deposition testimony at trial violated his constitutional right to be confronted with the witnesses against him as guaranteed by the 6th Amendment to the United States Constitution and Article

---

[6] The dissent takes strong exception to the prosecutor "flouting" this court's admonition in *Hale I.* In doing so, the dissent actually relies upon our law-of-the-case doctrine that has never been argued in this case. Although Mr. Hale argues on appeal that the prosecutor's use of his immunized testimony was prosecutorial misconduct, that argument is not preserved for appeal because it was not raised below. *Tucker v. State*, 336 Ark. 244, 983 S.W.2d 956 (1999).

2, section 10, of the Arkansas Constitution. Second, he argues that the use of video-deposition testimony was erroneous because Mr. Rutherford was not unavailable pursuant to Ark. R. Evid. 804(b)(1). Finally, he contends that the State failed to follow the procedure established by Ark. Code Ann. § 16-44-201.

 This court has consistently interpreted the Confrontation Clauses of the United States and Arkansas Constitutions to provide identical rights. *Smith v. State*, 340 Ark. 116, 8 S.W.2d 534 (2000). Here, Mr. Hale asserts that his Confrontation Clause rights were violated by the use of a video deposition because he was not able to meet the witness face-to-face. We recently summarized the seminal United States Supreme Court cases on this issue as follows:

> The United States Supreme Court held in *Coy v. Iowa*, 487 U.S. 1012 (1988), that "the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." Two years later, the Court held that the Confrontation Clause does not guarantee criminal defendants an absolute right to a face-to-face meeting with witnesses against them at trial. *Maryland v. Craig*, 497 U.S. 836 (1990). The Court further held that the right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where the trial court makes a case-specific finding that the denial of such confrontation is necessary to further an important public policy ... and only where the reliability of the testimony is otherwise assured. *Id.*

*Smith v. State, supra.* Mr. Hale contends that because the denial of face-to-face confrontation is not necessary in this case, the trial court erred in allowing the use of a video deposition. We disagree.

 The trial court specifically found that the use of Mr. Rutherford's video deposition at Mr. Hale's trial was necessary because the witness was unavailable to testify in person. In doing so, the trial court noted the history of the case: "They've had to fly this [witness] back from Africa twice for this trial." The State introduced into evidence an affidavit signed by Mr. Rutherford, which stated that although he was a resident of Texas, his business dealings take him out of the country most of the year, he would be in Africa or Great Britain on specific scheduled trial dates, and he had no foreseeable plans to return to Arkansas in the near or distant future. Mr. Rutherford also testified on direct examination by the State

that 80% of his life is spent abroad. Courts have consistently allowed the use of video depositions in similar circumstances where the witness was shown to be unavailable. *United States v. Mueller*, 74 F.3d 1152 (11th Cir. 1996) (where the witness was unavailable because he lived in London, England); *United States v. Gifford*, 892 F.2d 263 (3d Cir. 1989) (where the witnesses were located in Belgium and the government was unable to procure their attendance at trial); *United States v. Kelley*, 892 F.2d 255 (3d Cir. 1989) (where the witnesses were foreign nationals unwilling to travel to the United States for trial); *United States v. Salim*, 855 F.2d 944 (2d Cir. 1988) (where the witness was being held in custody by French police). "[I]t has been held that when a witness is actually unavailable at trial his prior testimony may be admitted if sufficient indicia of reliability are present." *United States v. Benfield*, 593 F.2d 815 (8th Cir. 1979) (citing *Mancusi v. Stubbs*, 408 U.S. 204 (1972) and *Barber v. Page*, 390 U.S. 719 (1968)). Likewise, this court has upheld the use of a witness's video deposition at trial when the record revealed that the witness was in London, England at the time of the trial. *Verdict v. State*, 315 Ark. 436, 868 S.W.2d 443 (1993). In this case, when the trial court found that the witness was unavailable to testify at trial, it thereby made the case-specific finding of necessity mandated by *Maryland v. Craig*, 497 U.S. 836 (1990).

Mr. Hale also argues that the deposition should not be allowed because Mr. Rutherford was not unavailable so as to fall within the hearsay exception found at Ark. R. Evid. 804(b)(1) for former testimony. We disagree. Ark. R. Evid. 804(a)(5) states that a witness is unavailable if he "[i]s absent from the hearing and the proponent of his statement has been unable to procure his attendance ... by process or other reasonable means." Mr. Hale does not dispute that Mr. Rutherford was absent from the hearing. Rather, he contends that the State did not make a sufficient showing that they were unable to procure Mr. Rutherford's attendance by process or other reasonable means. However, the State clearly submitted evidence that Mr. Rutherford was located outside of the United States, where he was not subject to subpoena or other process. In *United States v. Kelley*, the appellant raised an identical argument after the trial court admitted the deposition of witnesses located in Europe. The Eighth Circuit Court of Appeals stated: "[w]e conclude that since the government had no power to compel the witnesses to attend, it adopted a reasonable solution when it

deposed them in Europe." *United States v. Kelley, supra.* Accordingly, the State submitted sufficient proof that they were unable to procure Mr. Rutherford's attendance.

 Finally, Mr. Hale argues that the State failed to follow the procedure set forth in Ark. Code Ann. § 16-44-201. However, that argument is not preserved for appeal because it was not raised below. We do not address arguments raised for the first time on appeal. *Dodson v. State*, 341 Ark. 41, 14 S.W.3d 489 (2000). In his arguments below, Mr. Hale asserted a violation of section 16-44-202.[7]

### IV. Immunity — Defense Witness

Prior to trial, the State granted Rebecca Winemiller, a principal in FSA, immunity from prosecution in exchange for her cooperation with the State in this case. Pursuant to that grant of immunity, Ms. Winemiller gave a statement to the Little Rock Police Department concerning the circumstances surrounding a loan of $150,000 by FSA to Ink Jet at the request of Mr. Rutherford. At trial, the State did not call Ms. Winemiller as a witness. However, Mr. Hale subpoenaed her and sought to call her as a defense witness at trial, whereupon Ms. Winemiller asserted her constitutional right against self-incrimination under the Fifth Amendment. After hearing arguments from both sides, the trial court ruled that she would be allowed to assert her Fifth Amendment rights and refused to compel her to testify. The trial court further found that the State's grant of immunity to Ms. Winemiller would not serve to protect her if she were called as a defense witness. On appeal, Mr. Hale argues that the trial court erred in so holding and that the trial court's ruling violated his constitutional rights to due process, equal protection, a fair trial, and compulsory process.

 Mr. Hale's basic contention is that the trial court should have compelled Ms. Winemiller to testify by holding that the State's grant of immunity to the witness also extended to the defense's use of her testimony. We disagree. In *Fears v. State*, 262 Ark. 355, 556 S.W.2d 659 (1977), the defendant asked the trial

---

[7] On appeal, Mr. Hale has not argued section 16-44-202. He mentions the section in his point on appeal, but then makes no argument regarding it. Thus, that argument has been abandoned on appeal.

court to grant, or require the State to grant, immunity to a defense witness. The trial court refused to do so, and this court affirmed, stating:

> The granting of immunity is not a constitutional right but only one authorized by statute. ... [T]he granting of immunity is within the discretion of the prosecutor when in his judgment such a grant of immunity is necessary to the public interest. The purpose of immunity statutes is to aid the prosecution in apprehending criminals by inducing witnesses to testify for the State.

*Id.*; *See* Ark. Code Ann. § 16-43-605 (Repl. 1999). Likewise, in *Williams v. State*, 329 Ark. 8, 946 S.W.2d 678 (1997), a criminal defendant argued that his due process and equal protection rights were violated by the trial court's refusal to grant immunity to a defense witness. We restated our holding in *Fears v. State*, and affirmed. Our holdings in *Williams v. State* and *Fears v. State* were recently reaffirmed in *Tabor v. State*, 333 Ark. 429, 971 S.W.2d 227 (1998). Because immunity statutes are for the purpose of inducing witnesses to testify for the State, we cannot say that the trial court violated Mr. Hale's constitutional rights by refusing to grant Ms. Winemiller immunity as a defense witness.

### V. Cumulative Error

In his final point on appeal, Mr. Hale refers this court to "a laundry list" of errors that he argued below at the conclusion of the trial, and he asks this court to reverse on the basis of cumulative error and trial court bias. The State contends that this claim is barred because none of Mr. Hale's individual allegations are supported by argument or authority. We agree. Mr. Hale does nothing more than list the trial court's actions with which he takes issue. It is well settled that assignments of error unsupported by convincing authority or apposite authority will not be considered on appeal. *Williams v. State*, 329 Ark. 8, 946 S.W.2d 678 (1997).

Affirmed.

BROWN, J., concurs.

THORNTON, J., dissents.

R OBERT L. BROWN, Justice, concurring. I agree with much of what is said in Justice Thornton's dissent. This court took pains to be exceedingly clear in *Hale v. State*, 336 Ark. 345, 985 S.W.2d 303 (1999) (*Hale I*), that the State could not use any of Hale's immunized testimony in his trial for filing false documents with the State Insurance Department. Yet, that is precisely what the prosecutor did at trial. He used Hale's immunized testimony from the Tucker trial in his cross-examination. This was in direct violation of our admonishment in *Hale I*.

My problem with the dissent is that it invokes a *Wicks* exception relating to the trial court's duty to intervene to correct a serious error even when no objection has been made by counsel. *See Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980). In my opinion, the trial judge should have known that what the prosecutor was doing with Hale's immunized testimony at trial constituted a *Kastigar* violation. *See Kastigar v. United States*, 406 U.S. 441 (1972). But from the colloquy quoted in the dissent, the trial judge apparently did not know that *Kastigar* was being violated by use of the immunized testimony. It appears from the colloquy that the trial judge believed that if the immunized testimony being used did not relate to the charge for which Hale was being tried, a *Kastigar* violation did not occur.

I cannot hold the trial judge responsible for correcting a serious error *on his own motion* when the judge was not aware an error had been committed. Thus, I agree with the majority that the onus was on Hale's defense counsel to bring the issue to the trial court's attention by timely objection.

R AY THORNTON, Justice, dissenting. I respectfully dissent from the majority opinion. The United States Supreme Court made it clear in *Kastigar v. United States*, 406 U.S. 441 (1972), that any later use of immunized testimony is prohibited. This is the second time we have addressed the application of *Kastigar* to this case. In our previous decision, we specifically noted that "we admonish, as the trial court correctly did, that the *Kastigar* issue continues throughout the trial and prevents the State from impermissibly using any of Mr. Hale's immunized testimony, or the evidence derived therefrom, at any point in the State proceeding." *Hale v. State*, 336 Ark. 345, 985 S.W.2d 303 (1999). When this case was returned to the trial court, the State violated the rule estab-

lished in *Kastigar* by asking Mr. Hale questions involving his immunized testimony, notwithstanding our instruction against doing so. The trial court did not prohibit the use of this immunized testimony, but allowed the questioning to proceed. There was no immediate objection to this improper use of the testimony by defense counsel. However, as the questioning proceeded, defense counsel did object. This objection was overruled by the trial court. Under these circumstances, I believe that the trial court erred in permitting the use of such protected evidence. In my view, this should settle the matter. I would reverse the case based on the use of immunized testimony protected by *Kastigar*.

The majority concludes that we cannot reach this issue because the defense counsel failed to make a contemporaneous objection to the improper questioning. In so concluding, the majority is disregarding our holdings in previous cases which outline various exceptions to the plain-error rule. This court has consistently and uniformly eschewed review of plain error in appeals from the trial courts of this State. But we have also adhered to four very limited exceptions to our plain-error rule, which were listed in *Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980). In *Wicks*, one of those exceptions read:

> A third exception is a mere possibility, for it has not yet occurred in any case. That relates to the trial court's duty to intervene, without an objection, and correct a serious error either by an admonition to the jury or by ordering a mistrial.

270 Ark. at 786, 606 S.W.2d at 369. That, without question, is the situation in the instant case. The trial court had a duty to intervene and prevent a *Kastigar* violation, when this court had made it perfectly clear that Hale's immunized testimony was off limits in the trial. This is particularly true since the trial court was well aware of potential *Kastigar* problems. The trial court had held one *Kastigar* hearing which led to our decision in *Hale I* over the prosecutor's suspected use of Hale's testimony. In the case now before us, a second pretrial motion was filed which resulted in a hearing. The motion alleged that a *Kastigar* violation occurred when portions of Hale's grand jury testimony were found in the Little Rock Police Department files. With this background of familiarity with the prohibition against the use of immunized evidence under the *Kastigar* rule, the trial court was not blind-sided when the prosecutor

began a third violation of *Kastigar* by cross-examining Hale with a transcript of his immunized testimony from the Tucker trial. The trial court had the duty to intervene under the *Wicks* exceptions as soon as the State began using the immunized testimony. Further, when the violation of *Kastigar* was objected to by Hale, the trial court should have either given an admonition to the jury or declared a mistrial.

The record shows that when defense counsel did object to the prosecutor's use of Hale's immunized testimony from the Tucker trial, this colloquy took place:

> DEFENSE COUNSEL: And we would move that the charges be dismissed based on Kastigar at this time because, clearly, this has been used this testimony has been used that was immunized, and it has been used as (*sic*) for a purpose in this trial.
>
> PROSECUTOR: He's not being tried for this, and it's used to impeach —
>
> THE COURT: He's not being tried for this.
>
> DEFENSE COUNSEL: Well, it's not just — it's not it's for any purpose so to correct the investigation for impeachment and use at trial.
>
> THE COURT: That's denied.
>
> DEFENSE COUNSEL: And I figured that would be the answer of the Court in view of the position that has been in the past, but I needed to make my record. I needed to make it contemporaneously. And I apologize otherwise for interrupting.
>
> PROSECUTOR: Well, it (*sic*) you wanted it to be a contemporaneous objection, it should have been when I walked up there with the testimony and he was going —
>
> THE COURT: Oh, I understand. I understand.
>
> DEFENSE COUNSEL: I thought he was going to go to the —
>
> THE COURT: It's denied. Mr. Finkelstein [prosecutor], let's don't belabor this too much longer. Okay?

What the colloquy establishes is that the trial court did not recognize its duty to prevent the use for any purpose of prohibited immunized testimony. I would reverse this case because the trial

court failed to take any actions to prevent the jury's consideration of this inadmissible testimony, and because the trial court did not, upon objection, correct the serious error by giving an admonition to the jury, or by ordering a mistrial.

I certainly support this court's longstanding adherence to the contemporaneous-objection rule. But here, where the prosecutor was flouting this court's order against use of immunized testimony, the trial court as well as defense counsel had a duty to step in and correct the serious error under *Wicks v. State, supra.* Few principles of criminal jurisprudence are as sacrosanct as the right against self-incrimination. Because of this breach, Hale was not given a fair trial. I would reverse and remand for a new trial. For that reason, I respectfully dissent.